# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF GEORGIA

| | | |
|---|---|---|
| WARREN ERICKSON, | : | |
| | : | |
| Plaintiff, | : | |
| v. | : | FILE NO. _____ |
| | : | |
| ALACRITY SERVICES, LLC; | : | |
| GENESIS SOLUTIONS DESIGN, LLC; | : | |
| KLIPSPRINGER HOLDINGS, INC.; | : | |
| JAMES DAVID GIBBS; STANTON | : | |
| LONG; COTERMINUS SOLUTIONS, | : | |
| LLC; and GIBBS & LONG, LLC, | : | |
| | | |
| Defendants. | | |

## COMPLAINT FOR DAMAGES

Warren Erickson files this Complaint for Damages to recoup money owed to him as a 20% equity holder in Defendant Genesis Solutions Design, LLC. Almost three years after Lowe's Home Improvement purchased Genesis' assets as part of a deal estimated to be worth more than $25 million, Erickson has still not received any proceeds from the sale.

### INTRODUCTION

1.      Plaintiff Warren Erickson served as Defendant Alacrity Services' ("Alacrity") president from 2003 to 2006, earning a 3% equity interest in Alacrity.

2.      Alacrity was wholly owned by Defendant Klipspringer Holdings, Inc. ("KHI"), which in turn was wholly owned by two shareholders: Defendants James David Gibbs and Stanton Long.

3.      In 2006, Erickson agreed to forfeit his 3% interest in Alacrity and become President of Genesis Solutions Design, LLC ("Genesis")—a company newly formed by Gibbs and Long to develop intellectual property for Alacrity—in exchange for a 3% interest in Genesis and options for

an additional 17% contingent on Erickson achieving certain benchmarks. The terms of the agreement were memorialized in a 2006 employment contract between Erickson and Genesis. (*See* 2006 employment contract, Exhibit A, pp. 5-6).

4.      In a 2009 letter extending Erickson's employment contract, Gibbs and Long acknowledged that Erickson had met the benchmarks identified in the contract and therefore was a 20% equity holder in Genesis. (*See* 2009 letter, Exhibit B).

5.      The 2009 letter further provided that Erickson would not share in Genesis' "financial results (profits and losses)" until he contributed 20% of the capital required for Genesis' operation or he personally guaranteed 20% of Genesis' debt to Genesis.

6.      The letter did not attach any conditions that could have stripped Erickson's already-vested 20% ownership of Genesis equity.

7.      Erickson never contributed capital to Genesis' operations or personally guaranteed the company's debt, and therefore Gibbs and Long never permitted Erickson to share in Genesis' profits and losses.

8.      Gibbs and Long understood that Erickson's decision not to share in the company's financial results did not strip Erickson of his already-vested equity, as they continued to treat Erickson as an equity holder *after* he decided not to contribute capital or guarantee the debt. In a February 2011 memo analyzing the ramifications of a potential buy-out, Gibbs and Long told Erickson: "[T]he calculation of **your prospective share would be net of the debt owed by Genesis to Alacrity** if, as anticipated, this transaction is structured as an asset purchase, **which is consistent with the ownership provisions we all agreed to in August 2009**." (Emphasis added.)

9.      In May 2011, Gibbs and Long formed Defendant Coterminus Solutions, LLC ("Coterminus") to protect Genesis' and Alacrity's intellectual property from litigation. Coterminus

2

purchased Alacrity's and Genesis' intellectual property for $1.00 each, and assigned KHI 80% and

Genesis 20% control of Coterminus.

10.     At the time of the sale, Erickson became concerned that assigning Genesis only 20%

of control over Coterminus diluted Genesis's intellectual-property value as compared to Alacrity's

intellectual-property value. Yet, in numerous emails, Gibbs and Long assured Erickson that the 80-

20 split did not mean that Alacrity's intellectual property was four times more valuable than

Genesis' property. Rather, according to Gibbs and Long, KHI (Alacrity's parent) had to be assigned

an 80% or greater control in Coterminus to realize tax advantages. Gibbs and Long assured

Erickson that the relative value of Alacrity's and Genesis' intellectual property would be determined

on a deal-by-deal basis.

11.     Despite this assurance, from the time of the 2011 intellectual-property purchase until

March 2013, Defendants Gibbs and Long diverted revenue earned from using Genesis' intellectual

property into Alacrity, and grossly undercapitalized Genesis.

12.     During this time, Alacrity had total control over Genesis and treated Genesis as a

mere instrumentality. For instance, every month Alacrity decided how much Genesis would pay for

expenditures and debited that money from Genesis' account without consulting Genesis or giving

Genesis any say on whether the expenditures were reasonable. Another example: all Genesis

employees—including President Warren Erickson—were given Alacrity paychecks, enrolled in

Alacrity's benefits plans, and forced to sign and abide by Alacrity's employee handbook.

13.     As of July 2012, Gibbs and Long continued to view Erickson as a 20% equity holder

in Genesis. In an email, Long asked Erickson: "[I]f someone interested in GSD as an ongoing

business walked in and **wanted to buy all three of us for cash** what would you advise us to ask for

as the total cash price?" (Emphasis added.)

14.     In the weeks leading up to the Lowe's sale, however, Gibbs and Long claimed that Erickson was not—and had never been—an owner of Genesis. In a March 18, 2013 email, Gibbs wrote: "You are not now and never have been an owner of Genesis Solutions Design LLC or any of our other companies." (Emphasis in original.)

15.     In a March 20, 2013 email, Long threatened to file a lawsuit against Erickson if he asserted an ownership claim prior to the Lowe's deal. So Erickson didn't.

16.     In April 2013, national retailer Lowe's Home Improvement purchased all of Alacrity's and Genesis' assets—including the intellectual property held by Coterminus—for a sum believed to be greater than $25 million. Although Erickson was the President of Genesis, he was never consulted on or told the details surrounding the sale.

17.     Despite Erickson's 20% equity ownership in Genesis, Erickson has never received any proceeds from the sale.

18.     As the dominant entity controlling Genesis, Alacrity and its officers and directors—including Gibbs and Long—owed Erickson fiduciary duties. Alacrity and its officers and directors breached those duties by not distributing the money owed to Erickson after the Lowe's deal. Alacrity is also liable for receiving wrongfully transferred assets from Gibbs and Long.

19.     Genesis breached the 2006 employment contract by not paying Erickson his 20% equity interest in the company after the Lowe's sale. Furthermore, as a member of Genesis subsidiary Coterminus, Genesis and its officers and directors breached fiduciary duties owed to Erickson.

20.     Defendants Gibbs and Long breached numerous fiduciary duties owed to Erickson, and wrongfully transferred assets from accounts intended for Genesis'—and Erickson's—benefit.

4

21.     As the sole member of Genesis, Defendant Klipspringer Holdings, Inc.—a company entirely owned by Gibbs and Long—breached fiduciary duties owed to Erickson.

22.     Defendant Coterminus is liable for receiving the proceeds of the wrongfully transferred assets from Defendants Gibbs and Long.

23.     Finally, Gibbs & Long, LLC is liable for receiving the proceeds of the wrongfully transferred assets from Defendants Gibbs and Long.

### PARTIES AND JURISDICTION

24.     Plaintiff Warren Erickson is domiciled in Gainesville, Georgia.

25.     From April 2006 until April 2013, Erickson served as President of Defendant Genesis Solutions Design, LLC, and ran the company from his office in Suwanee, Georgia.  From 2003 to April 2006, Erickson served as President of Defendant Alacrity Services, LLC, and ran the company from Alacrity's office in Atlanta, Georgia.

26.     Alacrity Services, LLC is a Delaware limited-liability company that was registered to conduct business in the State of Georgia through the Georgia Secretary of State from May 31, 2002 until November 7, 2014, when it formally withdrew as an entity authorized to transact business in Georgia. Alacrity is still an active company in good standing in Delaware.

27.     From Alacrity's inception in 2002 to the present, Alacrity has regularly sold and continues to regularly sell its product—a network of contractors available to insurance companies— to Georgia businesses, and regularly emails, mails, and telephones Georgia residents as part of its business operations. Alacrity's main customers—insurance companies who need contractors— regularly hire Alacrity-managed contractors for jobs in Georgia. From 2003 until April 2006, Alacrity's then-President, Warren Erickson, operated the company from the company's office in

Atlanta, Georgia. Alacrity maintained an office with employees in Atlanta until 2010. Alacrity has received and continues to receive substantial revenue from its Georgia sales.

28.     Alacrity's registered agent for service in Georgia is Corporation Service Company, 40 Technology Parkway, Southsuite 300, Norcross, Georgia 30092. Alacrity's registered agent for service in Delaware is Corporation Service Company, 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808.

29.     Upon information and belief, Defendants Gibbs and Long are the only members of Alacrity.

30.     Defendant Genesis Solutions Design, LLC is a Delaware limited-liability company that was registered to conduct business in the State of Georgia through the Georgia Secretary of State from May 2, 2007 until June 22, 2015, when it formally withdrew as an entity authorized to transact business in Georgia. Genesis is still an active company in good standing in Delaware.

31.     Genesis had one place of business: Georgia. At the time Erickson's causes of action arose, Genesis was only authorized to transact business in two states—Delaware and Georgia—and Genesis did not have any employees or conduct any operations in Delaware. From April 2006 until April 2013, Genesis' President Warren Erickson led Genesis from his office in Suwanee, Georgia. During this time, Alacrity regularly used Genesis' product—intellectual property that facilitates the network of contractors available to insurance companies—in Georgia. For instance, Georgia contractors in Alacrity's network regularly used Genesis' Fire N' Ice application when servicing water claims. In addition, Genesis sold its intellectual property directly to Georgia businesses, and regularly emailed, mailed, and telephoned Georgia residents as part of its business operations. Genesis received substantial revenue from the sale and use of its intellectual property in Georgia.

32.     Genesis' registered agent for service in Georgia is Corporation Service Company, 40 Technology Parkway, Southsuite 300, Norcross, Georgia 30092. Genesis' registered agent for service in Delaware is Corporation Service Company, 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808.

33.     Defendant Klipspringer Holdings, Inc. ("KHI") is the sole member of Genesis.

34.     KHI is a Delaware corporation that dissolved on January 8, 2016. Its former principal place of business was either in Brentwood, Tennessee or Eugene, Oregon.

35.     KHI's registered agent for service in Delaware is National Corporate Research, Ltd., 850 New Burton Road, Suite 201, Dover, Delaware 19904.

36.     KHI transacted business in the State of Georgia from 2006 to 2014. As Genesis' sole member, KHI's officers, directors, and agents—Defendants Gibbs and Long—were authorized to act on behalf of and bind Genesis, a company based in Georgia. In that role, KHI and its officers, directors, and agents sold Genesis' products to Georgia businesses, received distributions from those sales, and regularly emailed, mailed, and telephoned Georgia residents. As the sole member of Genesis, and the wholly-owned parent company of Alacrity, KHI received substantial revenue from Alacrity's and Genesis' business within the State.

37.     Defendant Coterminus Solutions, LLC is an active Delaware limited-liability company in good standing.

38.     From May 2011 until March 2013, Alacrity and Genesis regularly sold products owned by Coterminus—intellectual property developed by Genesis and Alacrity—to Georgia businesses, and regularly emailed, mailed, and telephoned Georgia residents as part of its business operations. Alacrity received substantial revenue from the sale of Coterminus' property in Georgia.

39.     During this time, Coterminus was a mere instrumentality of Alacrity. As Defendant Long admitted in a May 16, 2011 email, Coterminus' corporate purpose was to hold and protect Genesis' and Alacrity's intellectual property from litigation. Although Coterminus ostensibly owned Alacrity's and Genesis' intellectual property, it did not enter into *any* contracts with the buyers of that property or earn any money from the use of the property. Instead, Alacrity and Genesis entered into contracts with those buyers, and received compensation from the deals. Indeed, during the entire time Coterminus held Genesis' and Alacrity's intellectual property it did not enter into any contracts period. Coterminus was at all times undercapitalized as it did not have *any* operating capital as of March 2013, and it did not observe corporate formalities that would have distinguished it from Alacrity.

40.     Coterminus' registered agent for service in Delaware is A Registered Agent, Inc., 8 The Green, Suite A, Dover, Delaware 19901.

41.     Defendant James David Gibbs, KHI, and Genesis are the members of Coterminus.

42.     Defendant Gibbs is domiciled at 1061 Wilshire Way, Brentwood, Tennessee 37027.

43.     At the time of the Lowe's sale, Gibbs was the Chairman of Coterminus. He was also an officer and director of Genesis, KHI, and Alacrity. Finally, Gibbs—along with Long, Erickson and another employee—was one of four "consulting services team leaders" at Genesis and Alacrity.

44.     As a "consulting services team leader" of Genesis and Alacrity, Chairman of Coterminus, and director and officer of Alacrity, Genesis, and Coterminus, Gibbs personally participated in the sale of Genesis' and Alacrity's product—insurance-claims management solutions—to Georgia businesses, and regularly emailed, mailed, and telephoned Georgia residents as part of the companies' business operations. Gibbs directed and controlled Alacrity's Georgia operations during office-wide meetings at Alacrity's Atlanta offices several times per year until

8

2010. As a 40% owner of Genesis and 50% owner of Alacrity, Gibbs received substantial revenue from Genesis' business within Georgia.

45.     Defendant Stanton Long is domiciled at 708 Horizon Road, Eugene, Oregon 97405.

46.     At the time of the Lowe's sale, Long was the Chairman of Genesis and Chairman of Alacrity, and an officer and director of KHI and Coterminus. Finally, Long—along with Gibbs, Erickson and another employee—was one of four "consulting services team leaders" at Genesis and Alacrity.

47.     As a "consulting services team leader" of Genesis and Alacrity, the Chairman of Genesis and Alacrity, and an officer and director of Alacrity, Genesis, and Coterminus, Long personally participated in the sale of Genesis' and Alacrity's products—insurance-claims management solutions—to Georgia businesses, and regularly emailed, mailed, and telephoned Georgia residents as part of the companies' business operations. Long directed and controlled Alacrity's Georgia operations during office-wide meetings at Alacrity's Atlanta offices several times per year until 2010. In addition, Long regularly visited and solicited business from Alacrity and Genesis' largest Georgia customer, AllState Insurance Company, while in Georgia. As a 40% owner of Genesis and 50% owner of Alacrity, Long received substantial revenue from Genesis' business within Georgia.

48.     Defendant Gibbs & Long, LLC is an active Delaware limited-liability company in good standing.

49.     Gibbs & Long, LLC's registered agent for service in Delaware is Business Filings Incorporated, 108 West 13th St., Wilmington, Delaware 19801.

50.     Gibbs & Long, LLC is a mere alter ego of Defendant Gibbs and Defendant Long; it was formed to exclusively transact Gibbs and Longs' personal business, including to receive monies

owed to Defendant Gibbs and Defendant Long after Lowe's purchased Genesis and Alacrity Services. Although Gibbs & Long, LLC is identified—along with Alacrity Services, Genesis, and Coterminus—as a party to the multi-million dollar intellectual property and asset deal with Lowe's, at the time of the sale Gibbs & Long, LLC did not have any intellectual property, business contracts, working capital, assets, liabilities, employees, contractors, or consultants.

51. Upon information and belief, Defendant KHI is the sole member of Gibbs & Long, LLC.

52. A United States District Court has diversity jurisdiction over the defendants under 28 USC § 1332 (a), as Plaintiff is domiciled in Georgia, none of the defendants are domiciled in Georgia, and the amount in controversy, exclusive of interest and costs, exceeds $75,000.

53. This Court has personal jurisdiction over the non-resident defendants under Georgia's long-arm statute, OCGA § 9-10-91.

54. Although the 2006 Genesis employment contract that created Erickson's 20% equity position has Delaware forum-selection and choice-of-law clauses (*see* Exhibit A at p. 13), Genesis sold all of its assets—including the 2006 employment contract—to Lowe's Home Improvement around April 2013. Lowe's subsequently transferred many of those assets—including Erickson's 2006 employment contract—to Alacrity Renovation Services, LLC. Therefore, no party in this case has the right to invoke the forum-selection or choice-of-law clauses.

55. Venue is proper in the Northern District of Georgia as Erickson performed his employment with Genesis and Alacrity in the Northern District.

### PIERCING THE CORPORATE VEIL

56. As described above, Coterminus was a mere instrumentality of Alacrity, a defendant this Court has personal jurisdiction over. If this Court determines that it cannot exercise personal

jurisdiction over Coterminus under Georgia's long-arm statute, it should nonetheless pierce the corporate veil to assert personal jurisdiction over Coterminus.

57.     As described above, Gibbs & Long, LLC is an alter ego of Defendants Gibbs and Long, defendants that this Court has personal jurisdiction over. If this Court determines that it cannot exercise personal jurisdiction over Gibbs & Long, LLC under Georgia's long-arm statute, it should nonetheless pierce the corporate veil to assert personal jurisdiction over Gibbs & Long, LLC.

58.     In addition, this Court should find that Coterminus and Genesis were mere instrumentalities of Alacrity, and pierce the corporate veil to hold Alacrity liable for Coterminus' and Genesis' breaches.

59.     After Coterminus purchased Alacrity and Genesis' intellectual property in 2011, Genesis and Coterminus became mere instrumentalities of Alacrity, and the companies did not operate as three legally distinct entities, to wit:

a.  The companies abused the corporate form from the beginning, when Gibbs and Long assigned Alacrity's parent company, KHI, an 80% ownership in Coterminus solely so that Alacrity and KHI could realize tax advantages. In a June 10, 2011 email, Defendant Gibbs—an officer and director of all three companies—admitted that the 80-20 split did not reflect the relative value of Alacrity's and Genesis' intellectual property.

b.  Coterminus and Genesis were grossly undercapitalized. At the time of the 2013 Lowe's sale, Genesis had $100 in cash and equivalents, while Coterminus had $0. In comparison, Alacrity had $1.6 million in cash and equivalents.

c.  After the 2011 intellectual-property sale, Alacrity didn't pay Coterminus—the owner of the intellectual property—or Genesis—the creator of the property—to use that property in its business. For instance, Alacrity provided Fire N' Ice to the contractors

11

in its network, which incentivized insurance companies to use Alacrity contractors, but didn't pay Coterminus or Genesis for the use of Fire N' Ice.

d.  Alacrity received a disproportionate amount of the revenue from the use and sale of the three companies' intellectual property. Although Genesis developed and Coterminus owned three of the companies' six "principal products"—as identified by Gibbs in May 2011—less than two years later—at the time of the Lowe's sale in April 2013—Alacrity had over $43 million in assets owed to it by users of the companies' intellectual property, while both Genesis and Coterminus had $0 owed to them.

e.  Although Alacrity and Genesis' intellectual property was used and sold in many of the same states, Alacrity was registered to do business in 19 states, while Genesis was only registered to do business in two states: Georgia and Delaware. Coterminus, meanwhile, was only registered to do business in one state: Delaware.

f.  All employees of Alacrity, Genesis, and Coterminus were enrolled in Alacrity's pension plan, 401(k), health-care plans, and had to follow Alacrity's leave-with pay and holiday policies. Genesis and Coterminus did not have any of the above plans or policies. All employees of Alacrity, Genesis, and Coterminus—including Genesis President Warren Erickson—were forced to sign and adhere to the Alacrity employee handbook. Neither Genesis nor Coterminus had an employee handbook.

g.  Alacrity paid the salaries of all Genesis employees, including President Warren Erickson. Alacrity then charged Genesis a percentage of the Genesis employee's salary that reflected how much time each Genesis employee spent working on Alacrity projects. All Genesis employees spent part of their time working on Alacrity projects.

Erickson, for example, spent about 50% of this time working for Alacrity. Coterminus didn't have any employees.

h. Alacrity determined how much Genesis paid each month in overhead and cost. Genesis had no say in what costs Alacrity determined were reasonable.

i. Of the three companies, only Alacrity had insurance. For the 2012-2013 coverage period, Alacrity had 10 different insurance policies protecting the company, including Professional-Liability Insurance, Workers' Compensation & Employers' Liability Insurance, and Directors & Officers' Liability Insurance. Alacrity assured Erickson that Genesis was covered by the above policies. By obtaining worker's compensation insurance for Genesis employees, Alacrity represented Genesis employees as its own employees. *See* OCGA § 34-9-120 (requiring that any company subject to worker's compensation [any company with three or more employees] provide worker's compensation insurance to its employees).

j. Neither Genesis nor Coterminus owned or leased real property. Alacrity leased offices in Eugene, Oregon.

k. Alacrity regularly held board meetings. Neither Genesis nor Coterminus *ever* held a board meeting.

l. Although Erickson was the President of Genesis—a company whose entire assets were being purchased by Lowe's—Alacrity never consulted him about the deal or gave him details of the transaction.

60. Defendants Gibbs and Long wrongfully abused the corporate form to increase the value of Alacrity at the expense of Genesis.

61. Alacrity is liable for the torts and contractual breaches of Genesis and Coterminus.

### FACTUAL BACKGROUND

62.     In February 2001, Gibbs and Long hired Erickson as Vice President of Insurance Services at Project Cost & Time, Inc., a former company owned by Defendants Gibbs and Long.

63.     In 2003, Gibbs and Long made Erickson President of another company they owned, Alacrity Services, LLC.

64.     Alacrity manages a network of contractors that it makes available to insurance companies for a fee.

65.     As part of his employment contract with Alacrity, Erickson received an option to purchase a 3% equity interest in Alacrity at the cost of $1.00 per percentage point of equity interest.

66.     In March 2006, Erickson realized the 3% ownership option in Alacrity by mailing a $3.00 check to KHI, which it accepted.

67.     After learning that Erickson intended to leave Alacrity to start his own insurance-claims management company, Gibbs and Long offered to start a new company that Erickson would operate and have a larger equity interest in: Genesis Solutions Design, LLC.

68.     Gibbs and Long formed Genesis Solutions Design, LLC on April 5, 2006, making their company, KHI, the sole member of Genesis.

69.     The purpose of Genesis was to develop intellectual property to aide Alacrity's business.

70.     The agreement—a 2006 employment contract—provided that in exchange for a $200,000 salary and a 20% ownership option in Genesis, Erickson would serve as Genesis' President and exchange his 3% interest in Alacrity for a 3% interest in Genesis along with options for another 17%. (*See* Exhibit A at pp. 5-6).

71.     Erickson accepted and performed the employment contract in Georgia.

72.     The ownership-option clause of the 2006 employment contract gave Erickson the right to obtain up to 20% of Genesis' shares for $1.00 per percentage point over three milestones: 3% immediately upon execution of the agreement, 7% after Erickson completed the development of certain intellectual property for Genesis, and 10% after Genesis attained a certain revenue benchmark.

73.     By executing the agreement, Erickson exercised the 3% option.

74.     After meeting the contractual milestones, in April 2009, Erickson exercised the remaining 17% by mailing a $17.00 check to Genesis, which Genesis accepted.

75.     In a July 2009 letter extending Erickson's contract for three years, Gibbs and Long acknowledged that Erickson had met the contractual benchmarks and properly exercised his options, and that therefore Erickson's 20% equity interest in Genesis had fully vested. (*See* Exhibit B).

76.     The letter further provided that Erickson would not share in Genesis' "financial results (profits and losses)" until he contributed 20% of the capital required for Genesis' operation or he personally guaranteed 20% of Genesis' debt to Alacrity.

77.     The letter did not attach any conditions that could have stripped Erickson's already-vested 20% ownership of Genesis equity.

78.     Erickson never contributed capital to Genesis' operations or personally guaranteed the company's debt, and therefore Gibbs and Long never permitted Erickson to share in Genesis' profits and losses.

79.     Gibbs and Long understood that Erickson's decision not to share in the company's financial results did not strip Erickson of his already-vested equity, as they continued to treat Erickson as an equity holder *after* he decided not to contribute capital or guarantee the debt. In a

February 2011 memo analyzing the ramifications of a potential buy-out, Gibbs and Long told

Erickson: "[T]he calculation of **your prospective share would be net of the debt owed by**

**Genesis to Alacrity** if, as anticipated, this transaction is structured as an asset purchase, **which is**

**consistent with the ownership provisions we all agreed to in August 2009**." (Emphasis added.)

80.     In May 2011, Gibbs and Long formed Coterminus Solutions, LLC, giving KHI

80% ownership and Genesis a 20% ownership of Coterminus.

81.     In June 2011, Genesis sold its intellectual property to Coterminus for $1.00.

82.     In June 2011, Alacrity also sold its intellectual property to Coterminus for $1.00.

83.     After Erickson expressed concerns to Gibbs and Long that assigning Genesis only a

20% control of Coterminus would dilute the value of Genesis' intellectual property relative to

Alacrity's intellectual property, Gibbs assured Erickson in a June 10, 2011 email that the 80-20 split

did not mean that Alacrity's intellectual property was four times more valuable than Genesis'

property; 80% was only assigned to KHI (Alacrity's holding company) for tax advantages. Gibbs

explained that the relative value of Alacrity's and Genesis' intellectual property would be

determined on a deal-by-deal basis.

84.     Despite this assurance, from the time of the June 2011 transfers until March 2013,

Defendants Gibbs and Long diverted a substantial amount of the revenue earned from selling and

using Alacrity and Genesis' intellectual property into Alacrity, and grossly undercapitalized

Genesis.

85.     As of July 2012, Gibbs and Long continued to view Erickson as a 20% equity holder

in Genesis. For instance, in a July 19, 2012 email, Long asked Erickson: "[I]f someone interested in

GSD as an ongoing business walked in and **wanted to buy all three of us for cash** what would you

advise us to ask for as the total cash price?" (Emphasis added.)

86.     At some point after finding out that they could become very wealthy from the sale to Lowe's, Gibbs and Long changed their tune. Less than two weeks from the sale, on March 18, 2013, Gibbs wrote to Erickson: "You are not now and never have been an owner of Genesis Solutions Design LLC or any of our other companies." (Emphasis in original.)

87.     In a March 20, 2013 email, Long threatened Erickson that he'd pursue a tortious interference of business relations action if Erickson asserted an ownership claim prior to the Lowe's sale, and warned Erickson to "hire the best lawyers you can and clear the decks of everything else you would like to do for some time to come."

88.     In April 2013, national retailer Lowe's Home Improvement purchased all of Alacrity and Genesis' assets—including the intellectual property held by Coterminus—for a sum believed to be greater than $25 million.

89.     The proceeds of the sale were placed into accounts for the benefit of Alacrity, Genesis, Coterminus, and Gibbs & Long, LLC.

90.     Despite his 20% ownership stake, Erickson has never received any proceeds from the sale of Genesis.

## COUNT I:  BREACH OF CORPORATE FIDUCIARY DUTIES

91.     Erickson incorporates the preceding paragraphs into Count I.

92.     As the dominant entity using Genesis as an instrumentality for itself, Alacrity and its officers, directors, and agents—including Defendants Gibbs and Long—owed fiduciary duties to Erickson, an equity holder in Genesis.

93.     As an officer and director of Alacrity and Alacrity's instrumentalities Genesis and Coterminus, Defendant Gibbs owed fiduciary duties to Erickson, an equity holder in Genesis.

17

94.     As a member of Alacrity and Genesis subsidiary Coterminus, Gibbs owed fiduciary duties to Erickson, an equity holder in Genesis.

95.     As an officer and director of Alacrity and Alacrity's instrumentalities Genesis and Coterminus, Defendant Gibbs owed fiduciary duties to Erickson, an equity holder in Genesis.

96.     As a member of Genesis subsidiary Coterminus, Genesis and its agents—including Gibbs and Long—owed fiduciary duties to Erickson, an equity holder in Genesis.

97.     As a member of Genesis and Genesis subsidiary Coterminus, KHI and its agents—including Gibbs and Long—owed fiduciary duties to Erickson, an equity holder in Genesis.

98.     Gibbs breached his duty of loyalty by not paying Erickson the money owed to him from the Lowe's sale.

99.     As an officer and director of all four named-sellers in the Lowe's deal—Alacrity, Genesis, Coterminus, and Gibbs & Long, LLC—Gibbs had the opportunity to ensure Erickson received the money owed to him.

100.    During negotiations with Lowe's, Gibbs further breached his duty of loyalty by overvaluing the relative value of Alacrity as compared to Genesis—to the detriment of Genesis and its equity holders.

101.    Long breached his duty of loyalty by not paying Erickson the money owed to him from the Lowe's sale.

102.    As an officer and director of all four named-sellers in the Lowe's deal—Alacrity, Genesis, Coterminus, and Gibbs & Long, LLC—Long had the opportunity to ensure Erickson received the money owed to him.

18

103.     During negotiations with Lowe's, Long further breached his duty of loyalty by overvaluing the relative value of Alacrity as compared to Genesis—to the detriment of Genesis and its equity holders.

104.     Alacrity and its agents breached their duty of loyalty by not paying Erickson the money owed to him from the Lowe's sale, and instead directing the money be used to further its own interest.

105.     During negotiations with Lowe's, Alacrity further breached its duty of loyalty by overvaluing the relative value of Alacrity as compared to Genesis—to the detriment of Genesis and its equity holders.

106.     Genesis and its agents breached their duty of loyalty by not paying Erickson the money owed to him from the Lowe's sale, and instead directing the money be used to further its own interest.

107.     During negotiations with Lowe's, Genesis further breached its duty of loyalty by overvaluing the relative value of Alacrity as compared to Genesis—to the detriment of Genesis and its equity holders.

108.     KHI and its agents breached their duty of loyalty by not paying Erickson the money owed to him from the Lowe's sale, and instead directing the money be used to further its own interest.

109.     During negotiations with Lowe's, KHI further breached its duty of loyalty by overvaluing the relative value of Alacrity as compared to Genesis—to the detriment of Genesis and its equity holders.

110.     Erickson suffered damages in excess of $75,000 from these breaches.

19

111.    Under the internal affairs doctrine, Delaware law applies to these breach of fiduciary duties claims.

## COUNT II:  AIDING AND ABETTING BREACH OF FIDUCIARY DUTIES

112.    Erickson incorporates the preceding paragraph into Count II.

113.    Alacrity owed Erickson a duty of loyalty.

114.    Gibbs knowingly aided Alacrity's breach of its duty of loyalty by personally directing and causing Genesis to not pay Erickson the money owed to him from the Lowe's sale.

115.    Gibbs further aided Alacrity's breach of its duty of loyalty by personally directing and causing Alacrity to overvalue the relative value of Alacrity as compared to Genesis—to the detriment of Genesis and its equity holders.

116.    Long knowingly aided Alacrity's breach of its duty of loyalty by personally directing and causing Genesis to not pay Erickson the money owed to him from the Lowe's sale.

117.    Long further aided Alacrity's breach of its duty of loyalty by personally directing and causing Alacrity to overvalue the relative value of Alacrity as compared to Genesis—to the detriment of Genesis and its equity holders.

118.    At the time Gibbs and Long aided Alacrity's breaches, they were aware or should have been aware that not paying Erickson was a breach of fiduciary duty.

119.    At the time Gibbs and Long aided Alacrity's breaches, they were aware or should have been aware that overvaluing Alacrity at the expense of Genesis was a breach of fiduciary duty.

120.    Genesis owed Erickson a duty of loyalty.

121.    Gibbs knowingly aided Genesis' breach of its duty of loyalty by personally directing and causing Genesis to not pay Erickson the money owed to him from the Lowe's sale.

122.    Gibbs further aided Genesis' breach of its duty of loyalty by allowing Alacrity to overvalue the relative value of Alacrity as compared to Genesis—to the detriment of Genesis and its equity holders.

123.    Long knowingly aided Genesis' breach of its duty of loyalty by personally directing and causing Genesis to not pay Erickson the money owed to him from the Lowe's sale.

124.    Long further aided Genesis' breach of its duty of loyalty by allowing Alacrity to overvalue the relative value of Alacrity as compared to Genesis—to the detriment of Genesis and its equity holders.

125.    At the time Defendants Gibbs and Long aided Genesis' breaches, they were aware or should have been aware that not paying Erickson was a breach of fiduciary duty.

126.    At the time Gibbs and Long aided Genesis' breaches, they were aware or should have been aware that overvaluing Alacrity at the expense of Genesis was a breach of fiduciary duty.

127.    KHI owed Erickson a duty of loyalty.

128.    Gibbs knowingly aided KHI's breach of its duty of loyalty by personally directing and causing Genesis to not pay Erickson the money owed to him from the Lowe's sale.

129.    Gibbs further aided KHI's breach of its duty of loyalty by personally directing and causing Genesis to overvalue the relative value of Alacrity as compared to Genesis—to the detriment of Genesis and its equity holders.

130.    Long knowingly aided KHI's breach of its duty of loyalty by personally directing and causing Genesis to not pay Erickson the money owed to him from the Lowe's sale.

131.    Long further aided KHI's breach of its duty of loyalty by personally directing and causing Genesis to overvalue the relative value of Alacrity Services as compared to Genesis—to the detriment of Genesis and its equity holders.

132.    At the time Gibbs and Long aided KHI's breach, they were aware or should have been aware that not paying Erickson was a breach of fiduciary duty.

133.    At the time Gibbs and Long aided Alacrity's breaches, they were aware or should have been aware that overvaluing Alacrity at the expense of Genesis was a breach of fiduciary duty.

134.    Gibbs and Long are personally liable for aiding and abetting Alacrity's, Genesis' and KHI's breaches of fiduciary duties in an amount greater than $75,000.

135.    Under the internal affairs doctrine, Delaware law applies to these aiding and abetting breach of fiduciary duties claims.

### COUNT III:   BREACH OF NON-CORPORATE FIDUCIARY DUTIES

136.    Erickson incorporates the preceding paragraphs into Count III.

137.    As an equity partner with Erickson, Defendant Gibbs owed Erickson fiduciary duties under Georgia law, OCGA § 23-2-58, in addition to the normal corporate fiduciary duties noted above.

138.    As an equity partner with Erickson, Defendant Long owed Erickson fiduciary duties under Georgia law in addition to the normal corporate fiduciary duties noted above.

139.    Gibbs breached his duty to Erickson by not paying Erickson his share of the Genesis equity after the Lowe's sale.

140.    Long breached his duty to Erickson by not paying Erickson his share of the Genesis equity after the Lowe's sale.

141.    Erickson suffered damages in excess of $75,000 from these breaches.

### COUNT IV:  BREACH OF CONTRACT

142.    Erickson incorporates the preceding paragraphs into Count IV.

143.    Erickson properly exercised his 20% Genesis ownership options as of April 2009. At all times thereafter Erickson owned a 20% equity interest in Genesis.

144.    The 2006 employment agreement between Erickson and Genesis provides that Erickson's ownership options "shall vest upon the closing of a Liquidity Event," which includes "the voluntary sale, conveyance, lease, license or other transfer of all, or substantially all, of the assets of Genesis." (*See* Exhibit A at p. 6).

145.    Genesis breached the contract by never disbursing the proceeds of the Lowe's sale after Erickson's ownership options vested.

146.    Erickson is owed 20% of the fair market value of Genesis' assets at the time of the sale to Lowe's. Erickson has been damaged in excess of $75,000 as a result of Genesis' breach of contract.

147.    Because Erickson executed and performed the contract in Georgia, Georgia law applies to this breach of contract claim.

## COUNT V:  WRONGFUL TRANSFER

148.    Erickson incorporates the preceding paragraphs into Count V.

149.    Gibbs and Long are personally liable under Georgia's Uniform Voidable Transactions Act, OCGA § 18-2-70 *et seq.*, as they transferred the money owed to Erickson from accounts set up for Genesis' benefit to accounts set up for the benefit of other entities, including Alacrity, Coterminus and Gibbs & Long, LLC.

150.    Genesis did not receive value from Gibbs' and Longs' transfers.

151.    As a result of these transfers, Genesis was likely to become insolvent, and in fact did become insolvent. Genesis is now unable to pay the money owed to Erickson.

152.   Gibbs and Long intended to make Genesis insolvent, and never intended to pay Erickson.

153.   Alacrity received funds from the wrongful transfer.

154.   Alacrity did not exchange reasonably equivalent value for the funds it received, and did not receive the transfer in good faith.

155.   Alacrity is liable to Erickson for receiving funds from the wrongful transfer.

156.   Coterminus received funds from the wrongful transfer.

157.   Coterminus did not exchange reasonably equivalent value for the funds it received, and did not receive the transfer in good faith.

158.   Coterminus is liable to Erickson for receiving funds from the wrongful transfer.

159.   Gibbs & Long, LLC received funds from the wrongful transfer.

160.   Gibbs & Long, LLC did not exchange reasonably equivalent value for the funds it received, and did not receive the transfer in good faith.

161.   Gibbs & Long is liable to Erickson for receiving funds from the wrongful transfer.

162.   Erickson's damages from the wrongful transfers exceed $75,000.

## COUNT VI: ATTORNEYS' FEES

163.   Erickson incorporates the preceding paragraphs into Count VI.

164.   Should Erickson succeed on his breach of fiduciary claims or his voidable transaction claim, Erickson is entitled to attorneys' fees upon a showing the defendants acted intentionally or in bad faith.

165.   If Erickson succeeds on his breach of contract claim, Erickson is entitled to attorneys' fees upon a showing that Genesis acted in bad faith.

24

## COUNT VII:  PUNITIVE DAMAGES

166.    Erickson incorporates the preceding paragraphs into Count VII.

167.    If Erickson succeeds on his breach of fiduciary claims or his voidable transaction claim, Erickson is entitled to punitive damages upon a showing that the defendants misconduct was willful.

WHEREFORE, Erickson prays that this Court:

(a) Enter a judgment against the defendants on all counts;

(b) Pierce the corporate veil as requested above;

(c) Hold a jury trial to determine damages, including attorneys' fees and punitive damages;

(d) Hold a jury trial, if needed, to determine liability;

(e) Grant such other and further relief, including costs, that this Court deems just and proper.

Respectfully submitted, this 12th day of February, on behalf of Warren Erickson.

THE GEBO LAW GROUP LLC


/s/ Carl A. Gebo
CARL A. GEBO
Georgia Bar No. 288711
*Admitted in Northern District of Ga.*

200 Walker Street, S.W.
Suite E
Atlanta, Georgia 30313
404-219-4516 (Telephone)
carl.gebo@gebolawgroup.com

GREEN, SAPP & MORIARTY, LLP


/s/ Daniel J. Moriarty
DANIEL J. MORIARTY
Georgia Bar No. 689867
*Admitted in Northern District of Ga.*

25

750 Hammond Drive
Building 8, Suite 200
Atlanta, Georgia 30328
770-690-8001 (Telephone)
770-690-8206 (Facsimile)
dmoriarty@greensapp.com